**UNITED FEDERATION OF POSTAL CLERKS, AFL–CIO, et al.,**
**Plaintiffs,**
**v.**
**The UNITED STATES of America et al.,**
**Defendants.**
**NATIONAL ASSOCIATION OF POST OFFICE MAIL HANDLERS, WATCHMEN, MESSENGERS AND GROUP LEADERS et al., Plaintiffs,**
**v.**
**The UNITED STATES of America,**
**Defendant.**
**Civ. A. Nos. 3593–69, 3595–69.**

United States District Court,
District of Columbia.

Oct. 17, 1973.

Donald M. Murtha, Jules Bernstein, Arthur M. Schiller, Robert J. Connerton, Herbert S. Thatcher (Deceased), Washington, D. C., for the plaintiffs.

Mozart Ratner, Washington, D. C., for the plaintiffs' attys.

Steven J. Bercik, Atty., Civil Div., Dept. of Justice, Gil Zimmerman, Asst. U. S. Atty., Eugene B. Granof, Atty., Labor Law Div., United States Postal Service, for defendants.

**14**

MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case came before the Court as a class action suit for overtime pay by qualified, annual-rate, regular U. S. Postal Service employees who were temporarily required to work in excess of their regular work schedules.[1] The action was settled by a Consent Order entered August 26, 1971. The question now before the Court is the determination of reasonable attorney's fees.

In making its determination, the Court found that since this was a class action, the standard for the award of attorney's fees as set out in Kiser v. Miller[2] was applicable and appropriate. The Court also found that the circumstances of this case preclude a single award for both past and future legal services. For the reasons discussed below, the Court found that the sum of $241,051.50 was a reasonable amount for past legal services. A precise figure could not be set for future legal services, therefore the schedule for its determination is also outlined in the discussion below.

I. BACKGROUND OF THE CASE

The Kiser standard[3] must be applied to the facts and circumstances of each class action suit. The two objective factors of time and hourly rate allow the Court the flexibility needed to make a fee determination which will reflect the individuality of each suit.

The case before the Court is intimately related to the case of the United Federation of Postal Clerks, AFL–CIO et al. v. Watson, 133 U.S.App.D.C. 176, 409 F. 2d 462 (1969), and commonly referred to as the Groettum case. The Groettum case was instituted by the Union on behalf of Mr. Groettum and a class of fellow union postal clerks to recover overtime pay due them for work (days or hours) performed outside of their regular schedules as a result of temporary schedule changes required by the defendants. The instant case is an offshoot of the Groettum case. It seeks recovery of back pay for an expanded version of the Groettum class (to include non-union regular postal workers) and has the same attorneys.

The principal attorneys in the instant case were retained by the Postal Clerk union. At the union's request, they instituted the Groettum suit. Under their retainer agreements counsel have received $89,960 for their services. Approximately a month after the Supreme Court denied certiorari in the Groettum case, the attorneys filed this action (December 19, 1969). The Groettum decision precipitated a settlement in the instant action by consent order on August 26, 1971. The consent order established rules for paying back overtime pay. The back compensation would be paid to certain present and former annual rate regular postal employees, or if deceased, to their representatives, for temporarily required work performed outside of their regular work schedules between March 4, 1966 and January 7, 1972.

The attorneys for both sides collaborated on the set of instructions for postal employees detailing the necessary procedures to establish a claim under the consent order. All parties agreed it would be advisable to test any claim procedures before they were instituted on a nationwide scale. Tests were conducted in three Florida post offices: Fort Lauderdale, Pompano Beach and Hollywood,

1. The action was filed on December 19, 1969 and consolidated with a suit filed on the same day by the Mail Handlers Division of the Laborers' International Union, AFL–CIO and the National Association of Letter Carriers, C.A. 3595–69. The actions were consolidated October 29, 1970.

2. Memorandum Opinion filed Aug. 29, 1973 in C.A. 2599–70 and 2088–71, 364 F.Supp. 1311 (D.D.C.).

3. See, id.; at 1315.

and in Tulsa, Oklahoma.[4] Despite revisions of the proposed instructions, the parties could not agree on the final form. The plaintiffs sought to hold the Postmaster General in contempt for non-compliance with the consent order. On April 4, 1973, the Court issued an order and opinion approving the defendant's proposed instructions without modification. The Order also adjudged the Postmaster General not guilty of contempt on the grounds that the delay in implementing the consent order was due to legitimate differences between the parties regarding the instructions.

On August 8, 1973, the Court entered an order for Partial Final Judgment leaving only the matter of attorneys' fees for the Court's disposition.

## A. *The Proposed Schedules of Attorneys' Fees*

In a hearing on the matter of attorneys' fees, the Court stated that the award would be made from the class recovery. Since neither the approximate number nor the approximate amount of each claim is determinable at this juncture, the actual class recovery is subject to extremely rough estimation. There are approximately 800,000 potential class members. However, without knowing how many will file claims or for what amounts, the estimated class recovery ranges from $10 million to $120 million.

The papers filed by both parties concerning the issue of counsel fees are numerous and thorough. Both sides propose different awards and different methods of fee calculation.

The plaintiffs suggest a sliding scale formula. The formula is based on the plaintiffs' estimate of the possible recoveries in the case. A declining percentage schedule, set out in full in the appendix, would allow a range of fees for *past* services from $1,000,000 (or 10% of a minimum recovery of $10 million) to $4,000,000 (or 2.5% of a maximum recovery of $120 million). The class members would provide for this fee and all future litigation by putting 20% of their individual recoveries into an escrow fund. Fifteen (15) percent of these escrow fees would be applied toward attorneys' fees, both past and future. The amount for past legal services (derived by the declining percentage scale mentioned above) would be deducted first. The remaining amount of the 15% would be applied to future legal services. This figure could range from $500,000.00 for a minimum recovery to $10 million to $14 million for a maximum recovery of $120 million. Counsel suggest that the precise award for future legal services be geared to an hourly rate. Any unused amounts reserved for future legal services would be returned to the claimants. The remaining 5% of the escrow fund would be applied towards costs and expenses including those incurred in arbitration of disputed individual claims.[5]

The Government proposes that counsel be awarded $200,000.00 for past legal services. This fee would be paid out of an escrow fund administered by the Postal Service. The government proposes that the fund be established by a 4% deduction of each class member's *initial* recovery. Should the claimants be dissatisfied with their initial recovery allowed by the postmaster and resort to arbitration, they could do so by paying a

---

4. The chosen offices provided a comparison of the problems involved in examining time records in those offices which used the time card method (Florida offices) and those which used the newer computer tape method (Tulsa). The Post Office Department also conducted, on its own, time card reviews in Atlanta, Ga., San Antonio, Texas, and Hanover, Pa.

5. Should there be a dispute between what each member of the class claims after reviewing his time records and what the U. S. Postal Service deems he is entitled to, the parties have agreed to refer the matter to arbitration.

$25 filing fee. The initial recovery would be subject to the 4% deduction as would the rest of the class to pay for past legal service. Any *excess* recovered through arbitration would be subject to an 8% deduction which would also be paid into the escrow fund to cover future attorneys' fees and arbitration costs. Under the government's plan, the administrative costs of arbitration would be paid equally by both the Postal Service and the escrow fund. The government's proposal provides that attorneys' fees and expenses would be paid from the escrow fund, but would require that each individual pursuing arbitration make his own arrangement with counsel for services on arbitration. Should the escrow fund be insufficient to pay attorney fees and expenses, and arbitration costs, the Government's plan provides that the government will make up the difference. On the other hand, should there be an excess of escrow funds, the Postal Service proposes that it deduct 5% of the *entire* sum which had been originally deposited to cover the cost of administering the escrow fund, and refund the excess to the claimants on a *pro rata* basis.

On September 14, 1973, the Court ordered that an escrow fund be established by deducting 5% of each individual's initial recovery. This would allow the Postal Service to commence processing claims, yet provide a fund from which an award could be made for past legal services.

6. Mr. Thatcher and Mr. Murtha, lead counsel in both this case and the *Groettum* suit, have requested that the Court regard this suit as one with the *Groettum* suit. They have submitted an estimate of 4,000 hours spent between 1966 and 1971 on the *Groettum* case. Although the cases are related, they are two separate actions. Counsel have treated them as such, by the mere fact that they felt it necessary to file a new suit. Counsel have been paid for their efforts in *Groettum*. To include the time spent on *Groettum* in setting fees for this case would in effect allow them to be paid for their work twice.

## B. *Plaintiffs' Counsels' Records*

Counsel have not kept time records. They have submitted to the Court estimates of the time they have spent in the instant case: [6] 2,600 hours for Messrs. Thatcher, Murtha and their associates; 1,800 hours for Mr. Bernstein; 550 hours for Mr. Connerton and 530 hours for Mr. Schiller.[7] The total hours spent is estimated at 5,480.

It is of concern to the Court that counsel can only supply the Court with their estimates of the time they have spent without any form of office logs or diaries to substantiate them. The same concern applies to counsels' estimate of $6,000.00 for past uncompensated expenses. Counsel has not offered disbursement records or receipts in any form to support this estimate. Whereas the good faith of counsel is obvious to the Court, this Court prefers to act on the basis of concrete facts.

## C. *Projected Future Legal Services*

The most difficult aspect of this case is the question of future legal services. This is due to the speculative nature of the problem. At this juncture, it is impossible to tell how many class members will file claims, in what amounts, what they will recover, how many will challenge that recovery in arbitration, or what the claimants will receive after arbitration, and thus what legal services are needed for the future.

7. Messrs. Connerton, Bernstein and Schiller are respectively General Counsel and Associate Counsels of the Laborers' International Union of North America, AFL–CIO. They are the attorneys in C.A. 3595–69 which was consolidated with the instant action. Upon the death of Mr. Thatcher the attorneys agreed that Mr. Bernstein would be principally responsible for assisting Mr. Murtha. Plaintiffs' counsel state that they have agreed that any award of fees would be divided internally with 75% for Mr. Murtha and his associates and 25% to Messrs. Bernstein, Connerton and Schiller.

Should a claim go to arbitration, counsel estimate that at least 21½ months of time will be involved from the time of filing a claim to arbitration.[8] Counsel have suggested that cases on arbitration could be handled more expeditiously by combining those claimants with similar factual or legal disputes into sub-classes. An arbitration of the representative claim then would be binding on all members of the sub-class. This procedure would reduce the cost of arbitration which is estimated at $700–800 per case plus an estimated $600 per case in added costs for attorneys' fees.

In attempting to obtain some form of perspective as to the future legal services needed in this suit, the Court has carefully studied the results of the pilot tests. The Court has found that the results of the tests are not sufficient to make reliable predictions because the ranges between the number of eligibles filing claims,[9] the size of the average claim,[10] and the number of claimed hours denied.[11] If a class recovery projection was to be based on these figures, it would range from $205 million (using Pompano as a basis) to $38 million (using Tulsa's figures).

According to the thorough papers of plaintiffs' counsel, if the test results were combined and averaged, they would show: 2,552 eligible claimants, of whom 586 examined their records and 336 filed claims (13%). The 336 claims sought 132,293 hours of overtime which would be valued at $264,586. The average claim was for 394 hours of overtime, valued at $788. On initial review of these claims the postmasters approved 43,373 hours (34%) and denied 84,834 (66%). On a national scale the combined results would yield $83,200,000 in claims upon initial presentation to the postmaster.[12]

Despite the drawbacks of the test results, it is possible to conclude that the number of claims which will be arbitrated will be quite small. At each level of the claim procedure, the number of claimants who proceeded to the next level was usually halved. Overlooking the unreliability of the tests to predict how many class members will even take the first step and review their time cards (only 23% of all those eligible in the tests took this first step), the tests may establish patterns for appeal and arbitration which can be applied to the future. Of those who reviewed their time cards only a little over half—55%—filed a claim. A little less than half of those who filed claims appealed the postmas-

8. Employees have 90 days to file a claim after notification of time record availability; the post office installation head has 90 days to notify the employee of its decision on the claim. The employee has 30 days to file a notice of appeal. The installation head has 45 days to reconsider its decision before submitting it to the regional office. The regional office has 150 days to review the claim after receiving it from the local office. The employee has 30 days to reject the regional office decision. From the date of the regional office decision, counsel have seven months to submit the claim to arbitration. Former employees and representatives of deceased employee have a three-year time limitation from July, 1973, if not notified, to request time records.

9. The employees were informed that their claims would not be prejudiced if they did not file during the tests, and could file them later. The percentages of eligibles who did file claims ranged between 20.5% (Pompano) and 8.2% (Tulsa).

10. The average claim ranged between $1,254 (Pompano) and $582 (Tulsa). When the Florida claims were broken down by 100 hours, over half fell below $600, and nearly half of these were in the $200-and-below category. The $200-and-below comprised 24% of the total number of claims filed in the Florida tests.

11. The number of claimed hours denied ranged between 34% (Pompano) and 88% (Fort Lauderdale). The parties have agreed that $2.00 is the appropriate hourly rate to be used in computing overtime pay.

12. If the Florida and Tulsa results were projected separately the Florida results would yield $121,600,000 claimed and $40,000,000 approved initially, while the Tulsa results would yield $30,400,000 claimed and $12,800,000 approved initially.

ters' awards (this includes Fort Lauderdale where the postmaster only approved 12% of the hours claimed).[13] Thus it is possible to conclude that the percentage of the class who seek arbitration will be less than 10% and closer to 5%. Five percent of the class, while small compared to the entire class of 800,000, is still no small number requiring future services.[14] The Court has found that due to the uncertainty of the number, complexity and merit of the claims on arbitration, a reasonable determination of the issue of attorneys' fees for future legal services demanded separate treatment.

## II. THE CLASS ACTION STANDARD FOR REASONABLE ATTORNEYS' FEES MUST CONSIDER TIME, EFFORT, SKILL, COMPLEXITY, RISK, RESULTS, INCENTIVE, AND PUBLIC SERVICE IN LIGHT OF THE ATTORNEY–CLASS RELATIONSHIP, AND NOT SOLELY A FLAT PERCENTAGE

█ Both sides have proposed attorneys' fee schedules which pivot upon a percentage of the recovery (i. e. a contingent fee structure). As this Court stated at length in *Kiser* [15] the use of contingent fee percentage in class actions has all the potential abuse to undermine the attributes of such actions. § 1.41 "Preventing Potential Abuse of Class Action," Manual for Complex Litigation, Moore's Federal Practice, Vol. 1,

Part 2, at 27–28 (1973). The increased litigation in the class action form makes it incumbent upon both the bench and the bar to realize the unique "attorney-client" relationship involved in class actions and to devise a more imaginative and applicable method for determining fee awards in such situations. The contingent fee, which emphasizes the amount of recovery, allows enormous awards to attorneys which are not reflective of the actual effort expended and which open the legal profession to justified criticism. A court award of fees must in all justice be a reasonable reflection of the legal services actually rendered. The primary focus in the determination of attorneys' fees in class actions must be upon: (1) the time and effort expended; (2) the skill needed to perform the legal services properly; (3) the risks involved; (4) the complexity and/or novelty of the legal issues; (5) the nature and amount of the results achieved. These factors must be considered against a background of the uniqueness of the "attorney-client" relationship, the element of public service involved and the need to motivate private counsel to represent the public and enforce the law. *Kiser, supra,* at 1315. *See,* § 1.47 "Control of Attorneys' Fees and Expenses in Class Actions," Manual for Complex Litigation, *supra* at 63–65; The American Bar Association Code of Professional Responsibility § DR2–106; *see also* Illinois v. Harper & Row Publishers, 55 F.R.D. 221 (N.D.Ill.1972).

---

13. Exclusive of Fort Lauderdale, the tests indicate that this number would be slightly under half. Averaged together, the results are still slightly under half.

14. Plaintiffs' counsel have categorized future service requirements as: (1) continuous monitoring, assessment and analysis of the processing cycle—sampling and spot-checking selected postal service installations, analyzing statistical data regarding the number of claimants reviewing their time cards, the number of claims filed, and the number of inquiries and questions; (2) continuing instruction, assistance and consultation with employees' preparation of their claims; (3) continuous negotiations and consultation

with the defendants at local, regional, and national levels to overcome unanticipated problems in the process, or in the interpretation of the instructions; (4) continuous and extensive correspondence with claimants concerning legal problems regarding their claims; (5) analysis and selection of appeals for arbitration; (6) processing the actual arbitration; and (7) *training programs at* national, regional, district and local levels to insure that local committees representing employees are available to assist claimants at all stages.

15. Kiser v. Miller, C.A. 2599–70 and C.A. 2088–71, 364 F.Supp. 1311 (D.D.C.) (memorandum opinion filed August 29, 1973).

The Court has found that this class action standard is as appropriate and applicable in the instant case as it was in the *Kiser* suit. The facts of the two suits are distinguishable, but the fundamental nature of the action—the class suit—is the same. The standard as applied in *Kiser* has the flexibility to allow its use in other class action suits. The *Kiser* formula has three variables which can be adjusted to compensate the attorney's skill and efforts, to reflect the complexity of the issues, to reward the legal creativity and to give an incentive or special recognition where it is needed or merited. The three variables are the amount of the hourly rate, the number of hours expended to further the action,[16] and the percentage of the incentive premium awarded.[17]

## III. UNDER THE KISER STANDARD AN AWARD OF $241,051.50 FOR PAST LEGAL SERVICES IS REASONABLE

In this case there was no discovery or litigation. Nor were there complex or novel legal issues, requiring indepth research, strategy or creativity. The legal issue had been decided in *Groettum*. From the exhibits that counsel have submitted the only legal research conducted in this case pertained to the question of attorneys' fees. However, this case did involve lengthy negotiations and conferences with the defendant's counsel in developing a plan for payment of the backpay claims. The instructions to the employees are extremely complete and detailed. The pilot projects also required the time and advisory skill of the attorneys. Relying on the good faith of the attorneys' and the Court's close examination of the pleadings and papers filed in this case,

the Court will accept counsels' time estimates discounted by 15 percent, thus leaving a total of 4,658 billable hours. The discount reflects the percentage of the time claimed which was devoted to C.A. 1611–69 [18] and the question of attorneys' fees.

In determining the hourly rate, the Court weighed both the amount of actual legal skill and experience required and the risk involved against the size of the class and the results achieved. Whereas the size and results are potentially exceptionally large, the risk and the need for *per se* legal efforts and creativity were greatly reduced because of the *Groettum* precedent. Therefore, the Court found that in this case an hourly fee of $45 is appropriate. Thus, the base total for the hourly fee is $209,610.00. Adding to this figure an incentive premium of 15%, the total award for past legal services is $241,051.50. Counsel may also recover $6,000 in expenses.

This award for fees and expenses is to be paid out of the escrow fund established on September 14, 1973 (Escrow Fund I), for the payment of past legal services. Any amounts remaining in the escrow fund are to be returned to the claimant/contributors on a *pro rata* basis.

## IV. THE AWARD FOR FUTURE ATTORNEYS' FEES AND ALLOWED EXPENSES IS GOVERNED BY THE KISER STANDARD AND SHALL BE PAID FROM A NEW ESCROW ACCOUNT ADMINISTERED BY THE POSTAL SERVICE

The Court has outlined the problems it faces regarding the question of

---

16. The Court may discount the number of hours counsel has submitted in its logs, if the Court determines, based upon the facts, circumstances and legal issues in the case, that the hours expended were unnecessary, unrelated or involved duplication of activity.

17. The incentive premium is an award in addition to the award for the hourly rate.

This award is determined by taking a flexible percentage times the total hourly fee.

18. This was the second *Groettum* suit filed June 13, 1969 and dismissed May 3, 1972. The first *Groettum* suit was for declaratory relief, the second was for recovery. This action was covered under the retainer agreement.

future legal services. The Court perceives that the future services will be of a more individual nature and involve separate facts and legal questions. The Court is also aware of a possible "chilling" factor attached to seeking arbitration if those who seek it are required to pay an additional amount for attorneys' fees. However, the Court finds that it is only equitable that those members of the class who will receive additional, more individualized services when they appeal their award should pay for what they receive, rather than taxing all those who do not receive addititional services. Furthermore, the initial tax on the recovery of those who seek arbitration for past attorney's fees will not be an unbearable bruden. Their portion of the award when spread across the entire class of claimants will be minimal.

In determining a schedule for future fees, the Court cannot accept the government's contigent fee proposal. Despite the more individualized services rendered, those seeking arbitration are members of a class, albeit a subclass, and counsel have indicated that they will treat the claims on arbitration as mini-class actions due to the potentially large number seeking arbitration. Thus the *Kiser* standard is applicable to determine the reasonable fee for the services rendered.

Since the costs of arbitration and future attorneys' fees are unknown at this point the Court finds that a new escrow fund (Escrow Fund II) must be established. One-third of each individual's additional recovery (the amount in excess of what he would have received had he accepted the postmaster's decision) is to be deposited in a banking institution in the District of Columbia at the highest legal rate of interest. This fund will provide for future attorneys' fees and one-half of the expenses of the arbitration process. The Postal Service has obligated itself to pay the other half of the arbitration process costs. Each individual seeking arbitration will pay a separate filing fee of $10.00. This will also be deposited into the fund. After the award of attorneys' fees (the schedule is set out below) and the deduction for the costs of arbitration, any sums remaining in the Escrow Fund II are to be redistributed to Fund II's contributors on a *pro-rata* basis. The fund is to be administrated by the defendants.

It is incumbent upon the attorneys on both sides to remember their responsibilities and obligations to the members of the class. The attorneys' objective must be to achieve the highest quality of justice in the least possible time at the lowest possible cost. The defendants must make every attempt to insure that their local postmasters and regional officers are knowledgeable and adequately trained to process all claims fairly, and that they provide all the assistance that their employees need to file their legitimate claims. This cooperation by the defendants will hopefully reduce the number filing for appeal and arbitration and will eliminate the need for plaintiffs' counsel to conduct spot checks, review statistical data and provide extensive individual assistance before a claim is ripe for arbitration. Plaintiffs' counsel have the responsibility to pursue legitimate claims in arbitration and handle these in the most expeditious and least costly manner. Their plan of mini-classes appears to the Court as the most creative method of providing the greatest justice at the least cost of time and money. The Court instructs them to use this whenever possible. Counsel are to concentrate their efforts on the cases on regional appeal and arbitration.

As to the attorneys' fees for future services, counsel are to keep complete and detailed records of the time they have expended and the nature of their activity. These logs they will submit to the fund administrator, who will pay the counsel fees according to the following schedule:

$50 per/hr. for time actually spent in arbitration proceedings.

$45 per/hr. for legal research, out-of-arbitration negotiations with the defendants, and preparation for arbitration proceedings (not including drafting letters, attorneys' conferences to review papers filed or received).

$30 per/hr. for time spent analyzing and selecting cases for arbitration, any necessary attorney conferences, all work of an administrative rather than legal nature, including monitoring activity.

Should a law clerk conduct any of the legal research, precise time records are to be submitted for his/her work which will be compensated at the rate of $7.00 per hour. Secretarial services and other office services are not to be compensated separately as they are to be included in the hourly counsel fee.

Upon the final payment of attorneys' fees, counsel shall also be entitled to an incentive premium of 15% of the total attorneys' fees awarded from Fund II.

Regarding expenses incurred, counsel will keep detailed records of all disbursements. Travel (at the economy rate), telephone costs, postage and xeroxing are expenses for which counsel can be reimbursed from the escrow fund.

The Court will rely on plaintiffs' counsels' responsibility as a fiduciary to see that accurate and verified records are submitted to the defendants. The defendants shall rely on plaintiffs' counsels' good faith representations and pay the appropriate fees according to the records presented. Attorneys' fees and allowed expenses shall be paid in increments of $50,000.00 as sums accumulate in Escrow Fund II sufficient to meet those payments and the then current administrative costs of arbitration payable from the Escrow Fund. Detailed records are to be kept of any expenditure for the administrative costs of arbitration.

The defendants have agreed to pay the fees and costs if the sums placed in the escrow account prove to be insufficient to pay future attorneys' fees, allowed expenses, and 50% of the administrative costs of arbitration. If the sums placed in Escrow Fund II are more than sufficient to pay these three items, any remaining funds shall be returned to the claimant/contributors on a *pro-rata* basis except if such remainder is $4.00 or less for each claimant/contributor in which case, the amount will be paid to the defendant Postal Service for the administration of the Escrow Fund II.

An order will be entered in accordance with this opinion, of even date herewith.

APPENDIX

| COLUMN A | COLUMN B | COLUMN C | COLUMN D | COLUMN E | COLUMN F |
|---|---|---|---|---|---|
| Possible Recovery in Increments of $10 Million Dollars | Percentage allowable as a Fee to Counsel for Plaintiffs for Past Representation as Applied to Each $10 Million Dollar Increment | Total Amount of Fee For Past Representation Pursuant to Declining Scale in Column B at Each $10 Million Dollar Increment | Overall Percentage of Fee for Past Representation at Each $10 Million Dollar Increment | Remainder of 15% Fee Deduction (After Subtraction of Column C Amount) Available for Future Representation, Including Arbitration * | Amount of 5% Deduction for Costs and Expenses Including those Incurred in Arbitration * |
| 10 Million | 10.0% | $1,000,000 | 10.0 % | 500,000 | 500,000 |
| 20 Million | 5.0 | 1,500,000 | 7.5 | 1,500,000 | 1,000,000 |
| 30 Million | 2.5 | 1,750,000 | 5.83 | 2,750,000 | 1,500,000 |
| 40 Million | 2.5 | 2,000,000 | 5.0 | 4,000,000 | 2,000,000 |
| 50 Million | 2.5 | 2,250,000 | 4.5 | 5,250,000 | 2,500,000 |
| 60 Million | 2.5 | 2,500,000 | 4.16 | 6,500,000 | 3,000,000 |
| 70 Million | 2.5 | 2,750,000 | 3.94 | 7,750,000 | 3,500,000 |
| 80 Million | 2.5 | 3,000,000 | 3.75 | 9,000,000 | 4,000,000 |
| 90 Million | 2.5 | 3,250,000 | 3.61 | 10,250,000 | 4,500,000 |
| 100 Million | 2.5 | 3,500,000 | 3.5 | 11,500,000 | 5,000,000 |
| 110 Million | 2.5 | 3,750,000 | 3.4 | 12,750,000 | 5,500,000 |
| 120 Million | 2.5 | 4,000,000 | 3.3 | 14,000,000 | 6,000,000 |

* Any portions of these funds not exhausted by the claims procedure are to be refunded to claimants on a *pro rata* basis.